and I'll take those in turn and I'll try to do that succinctly. First, holding out, it is important note that the trial court held that the plaintiff had met her burden on holding out and we think that was correct. There is evidence abounding on holding out here. It consists of not only the advertising specific to Dr. Hobson but also, as Ms. Prutton outlines in her affidavit, she had seen evidence, I will strike that, she had seen advertisements before she became pregnant with Alexis, which is the focus of this case, where the hospital was promoting itself and the quality of the doctors who practiced there. None of those advertisements stated that the doctors were not employed by the hospital. That is evidence of holding out. The hospital admitted in request to admit, answered a request to admit, that Dr. Hobson's likeness was displayed on its website in the years leading up to this birth. That website did not advise the viewing public that Dr. Hobson was not an employee. Dr. Hobson herself admitted in her deposition that she wore scrubs during this delivery provided by the hospital that had the Kishwaukee identifying marks on it. And finally importantly, neither Dr. Baumgarten nor Dr. Hobson ever discussed their employment status with Sherry. There is an issue with the consent form that I'll address how the trial court thought of that. But we do have problems, just to highlight quickly, about the timing of the signature on the appellate, or excuse me, on the consent form. It's our position that the fact that Sherry Prutten had been in the hospital receiving care for about 2 hours 15 minutes, she was receiving anesthesia at the time she signed it, that creates a question of fact about what she knew and when she knew it in regard to the independent contractor disclaimer, and whether that is a sufficient basis for summary judgment. It's our position that given the timing and the circumstances that that's a fact question for the jury. In regards to reliance, the law of Illinois is that that's satisfied if there's evidence that the plaintiff relied on the hospital versus a specific physician. That reliance need only be partial. The plaintiff meets the reliance element when they present evidence that they relied on the hospital. And that's important in this case because we believe it's clear from the record that Sherry Prutten did not pick Dr. Baumgarten nor Dr. Hobson ultimately, but she picked the hospital as the place where she was going to deliver Alexis. And she did so based on a couple different factors, at least the advertising that I mentioned earlier that she had seen before she became pregnant with Alexis, where the hospital is promoting itself and Sherry Prutten's affidavit, which is in the record at C-599 and C-600 in paragraph 6a through paragraph 8, it lays out the facts that we believe are sufficient to create a fact question on reliance and why she was relying on the And when you view that in the light most favorable to Sherry, as is appropriate, that is something that has to go to the jury. And if you look at the trial court's ruling, our concern and where we think the error lies is that trial courts, you know, weighted that evidence versus the consent form, the consent form, and held that, well, okay, you've got these things that militate in favor of the plaintiff, but at the end of the day, we've got this language in the consent form. So on the basis of that language, the trial court held that plaintiff could not create a question of fact on reliance. And that goes back to what I said earlier about, from our perspective, that's an inappropriate weighting of the evidence. You know, the court outlines in its second, I mean, second transcript, where it actually hands down its verdict, a number of factors that the court considered, and I believe there were nine of them. And if you look closely at those, there is evidence on both sides of those. Some that supports the plaintiff, perhaps some that supports the defense. If you read some of the cases that underlie those principles, they militate on both sides, for which reason we do feel that the court erred in entering summary judgment. Yes, your time is up, and so now we go to the portion of the case where Justice Hutchinson will ask questions now, if she has any. Yes, thank you, I do. Ms. Quinn, I'm looking at one of the ads, or one of the pieces of when Dr. Hobson joined the practice, or joined, or got hospital privileges, let's put it that way. And it starts out, better medicine begins with bright minds. And it identifies the hospital, it says, Kishwaukee is pleased to welcome Paula M. Hobson, MD. Dr. Hobson, who was an obstetrics nurse at Fish Hospital before going to medical school, has joined the medical staff and is practicing with Dr. Joseph Baumgart at Northern Illinois Fertility in DeKalb. Is there anything in that particular notice that indicates, or could indicate to your client that, you know, Dr. Hobson was not employed by the hospital? I think if you look at it from the standpoint of a layperson, you know, who does not have experience with hospital practice, you know, practice groups, their interactions with the hospitals, and whether they are affiliated with the hospitals, and how, I think that that language is very vague, it's ambiguous, and it allows for different conclusions to be drawn by a reasonable person who reads it. So I think that that language certainly would invite a reasonable person to conclude that Dr. Hobson is an employee of the hospital. I do recognize that there's a reference to the Northern Illinois Fertility, but it doesn't set out that that's a separate entity from the hospital. You know, I think that involves some reading into that, which, you know, can create competing inferences or invite different conclusions. Now there's another news release about welcoming new doctors, and there are several of them mentioned Dr. Hobson being the second one in order. And again, it's referenced that she, let's see, she was an obstetrics nurse at Kishwaukee Community Hospital several years before going on to medical school. She's the only one that they talk about prior experience with the hospital, and it's the same phrase they used in the other release that we just talked about. Does that add any, any emphasis to what the hospital is trying to accomplish? They're, they're lauding that she worked with them before, and now she's back. Does that seem to indicate she might be employed by the hospital? I think certainly it does, you know, by highlighting the fact that she was our nurse, and now she's coming back as a doctor. I think that definitely highlights a pre-existing relationship that Dr. Hobson had with the hospital that a reasonable person, again, could draw that conclusion that, oh, I mean, she was there as she was employed as a nurse, and now she's coming back as a doctor. And again, the public policy is that it's on the hospital to make these decisions, and where there's, I think it's pretty clear here that that suggests she is an employee. But to the extent there is ambiguity, that militates against the hospital. Okay. In, in the actual consent that she signed, it's, it's a one-page document, it looks like, opposed to, as opposed to something talked about in Spiegelman, I think that there were several different issues in this consent form that might have been confusing. Is there anything in specific here in this single-page document that might be confusing to the person signing it? We'll talk, I'm not worried about when at this point, just the document itself, when it, not when it was signed, but the document itself. Well, the document itself, leaving aside the timing, yes, Judge, and we do, we highlight some of that, or a lot of our problems with that in our brief. It's a multi-part consent form, which a lot of the appellate court cases on this issue highlight as problematic. Because, especially when you have something only on one page, if that's in fact what this is, and when she receives it, then, you know, that small print, you know, that has a kind of colloquial understanding or definition, but, you know, it, it fits into the larger narrative of this being a vague or confusing form when it contains multi-parts. When there are acknowledgments of subjects other than the independent contract or disclaimer, you know, it does cover other topics, including risks of the procedure, discussion of alternate treatments, you know, there, I believe there's something about disposal of human tissue in there. So it, it does not focus the person presented with that form on one particular issue, and it's multi-part, it's small print, and I think a reasonable person may not get what it's trying to convey in regard to the topic of the independent disclaimer. And how about looking at the, oh, I'm sorry, go ahead. Oh, I'm sorry. You know, where, there are some other cases that say, if you want to make this you know, if you want to rely on this later, and in support of a motion for summary judgment or a trial on a parent agency, you know, there are things you can do, which they have not done in this case. You know, the initials for, for Sherry Prutten aren't immediately adjacent to the employment status disclaimer, but, you know, it's, I think if you look at the consent form, I think it's related to billing. So that is something that should be taken into account as well. They have the opportunity to make this clear, so you have to see, did they do that? Okay, and then one, one last question. The very next paragraph under the one that says, I understand that the physicians who participate in the procedure are not employees or something. The next paragraph says, I think that is a very good question. And I don't know if we raised that in our brief, but as you asked the question, it does catch my ear. And I think that it and those persons who are identified in that consent form. And again, if, if that is something that creates ambiguity, that's something that should be, you know, resolved against the hospital as the moving party. And I want to be sure I'm clear, your client shows Kishwaukee Hospital for because she had been, she had had two prior deliveries there and she had some other medical procedures and she was happy with the hospital. Is that correct? That is one of the reasons that factually she did deliver two babies there prior. If you were to read her affidavit, she sets forth some other bases for her, the reason she went there. One of them being that, you know, she had seen these advertisements before becoming pregnant with Alexa and, you know, they were promoting the quality of healthcare, the quality of their doctors. And yeah, when you put that together with the prior experience that she had there, which were good ones, which the case law says is an acceptable reason for, you know, for reliance. You put that all together and yes, certainly her prior experience is factored into that, but it wasn't the exclusive reason. Okay. Thank you very much, Mr. Quinn and Justice McClure and I have no other questions at this time. Thank you. Justice Bridges, do you have any questions? Yes, I do. Thank you. Counsel, you said this repeatedly about she had seen these advertisements. When I look at her deposition, it supports the conclusion that the plaintiff even saw the hospital's ads regarding Dr. Hobson. Specific to Dr. Hobson, I don't know that she was ever asked. So, was she asked that in her deposition and did she give that answer in her deposition? I don't believe she did. And that's my question. She only said she had seen ads. She never specifically said she had seen any ad or billboard that indicated they worked for the hospital. Is that correct? That the doctor did or doctors generally are specific to Dr. Hobson. If I'm correct, I would note this and we certainly set this out. I'm sorry. You make reference that she had seen these advertisements. There's no evidence in her deposition. There's nothing that said she had seen advertisements related to these doctors, correct? Dr. Hobson, I think that's correct, Judge, but I would note that the case law states that with regard to the holding out and the reliance, it doesn't have to be reliance on a particular holding out. So, the fact that she may not have seen the advertisements specific to Dr. Hobson under the case law is not something that should result in the entry of summary judgment. She can rely on other things. Wasn't your client's major concern obtaining doctors that were covered by Medicaid? Well, Judge, I don't think that is the case. I think her major concern was making sure she was actually given the choice of, well, not the choice, but she was given names of two hospitals. Here's some doctors at Rochelle, I believe it was community hospital, and she said, as well as Kishwaukee. She made it clear, I want to deliver at Kishwaukee. She made the choice of the hospital, and that's the only reason she even ended up seeing Dr. Baumgart, who was the name that was given to her, that she received through that process, which I think is significant because we're talking about Dr. Hobson. Dr. Hobson wasn't even the doctor she initially saw. Dr. Hobson happened to be a partner, I believe, with Dr. Baumgart, but Sherry didn't know that, and that was never discussed with her. I think the evidence shows Sherry was relying on the hospital and not on anything about Medicare or Medicaid. With respect to Dr. Hobson and Baumgart, she met them throughout her prenatal care away from the hospital, never at the hospital. Is that correct? That is correct, and I think that's okay under the case law. The Williams case, I think, is significant because it's actually an OB-GYN case as well, and the plaintiff in that case had seen the OB-GYN for seven years at an outside location, and a parent agency was still resolved in the plaintiff's favor, so it didn't far that way, but yes, that's true. Okay, and so let me ask you this with respect to the written consent. The cases that you cite in your brief where written consent did not defeat a finding of a parent agency, they all involve situations where the patient first met the doctors at the hospital. Isn't that the case? In all of those cases, Judge, I can't say with respect to every case whether that was true. Certainly, that is a fact pattern, but I would, again, point you back to the Williams case. Certainly, that was a case where the plaintiff had seen the doctor on an off-site location, so that's at least one case that does not fall within that fact pattern. But there were not cases like this where the patient had chose the doctors who your argument, is that correct? Well, the Williams case, there might be differences in the facts, as there always are with these cases, but to the point, the way I interpreted the question, you know, does the fact that the patient did not first encounter the doctor in the hospital, does that bar a finding of a parent agency or reliance? I think that's why I pointed to Williams, because I think Williams says, no, it doesn't. And there are other cases, you know, there are probably other cases in that same vein, but Williams is certainly one I can point to right now. Counsel, your brief essentially seems to argue that this court should hold that vicarious liability applies to anyone providing treatment in a hospital. Is that your position? Not necessarily, Judge. I think, under the facts of this case, the hospital should be held responsible for the negligence of any physician where the patient, the plaintiff, can satisfy the elements of a parent agency. So, maybe not in every case can the plaintiff say, I was relying on the hospital. You know, there are plenty of cases on appeal where the plaintiff loses because the plaintiff cannot prove reliance or can't prove holding out. So, I don't think I would state it that broadly. I would say, under the facts of this case, the plaintiff has met the burden on the relevant elements. Thank you, Mr. Quinn, and thank you, Justice McClaren. I have no further questions. Thank you, Judge. Thank you. I only probably have one question, and that is, this isn't your typical Hobson's choice, is it? The typical Hobson's choice in what respect? That you have a free choice of only one thing that is offered. It would seem that your argument relates to both hospital and to doctor. So, you have two choices. You can either go to the hospital you want, or you can go to the doctor that you want, or you can even come up with a third possibility or choice, and that is, go to the hospital you want and also get the doctor you want. And so, the question then becomes, these choices that you make are supposed to be based upon some sort of holding out that the hospital has made, and apparently was made before the choices or choice was made. Okay. So, if there's a holding out, was this holding out before your client, the plaintiff, decided where she wanted to go? So, I think her affidavit at paragraphs 6A, well, the affidavit generally, I think, discusses, yes, there were holding out that she did see where she highlights, and she even mentioned it in her deposition as well. I don't want to confine it, I think, just to her affidavit, but it relevant to holding out under the case law. She did see those before she became pregnant with Alexis and before she made the decision that she wanted to rely on the hospital in this case. So, the answer to that question, I think, would be yes, there were holding out that exist in this case before she made that decision. How big a factor was her choice that the hospital that she wanted to go to had to be covered by her insurance? You know, I don't know that she was asked that question, Judge, so I don't know that I can speak to that, if that's an important point. Well, I thought I read that she inquired of her insurance coverage, her insurance carrier, what hospital or hospitals she could go to that they would pay for. Is that not in the record? Well, I suppose I read it a little differently that there was at least another piece of that, that she wanted to go to Kishwaukee because she felt that it was a hospital with a good reputation of providing quality care on the basis of, you know, holding it out that she had seen on that issue, advertisements as well as based on past experiences that she had there. So, the specific question, which is why I said I don't know that I could answer is, how did she herself weight those things, you know, who would pay for it or how would it be paid for versus her just personal preference? I can't absolutely answer that question about which more important or how you would weigh those, but she certainly was not asked in that regard. I think that she clearly has set forth evidence that she was relying at least in part on the reputation and what she understood to be the relationship between the doctors and the hospital. Thank you. I have no further questions. Justice Hutchinson, do you have any questions? No, no, thank you. Justice Bridges, do you have any other questions? No, thank you. Thank you. Okay, you'll be given five minutes for rebuttal after the appellee has presented his side of the case. Thank you. Thank you, Judge. Sure. Sure. Miss, Mrs. Weiler? I'm fine, thank you, Your Honor. Okay. Good morning, everyone. May I please report my name is Catherine Weiler, and I represent the Defendant Appellee Kishwaukee Community Hospital in this appeal. Just as a technological point, if anyone at any time has an issue hearing or understanding me, please do let me know. I'm happy to adjust as much as I can to make sure that what I'm saying is clear and easily understandable. Justice McClaren, I'd like to start with your point about a Hodgson's choice, because as delightful as the turn of phrases in this particular situation, I think it's actually a really important point that the doctrine of apparent agency is not about a choice between taking all or nothing. It is not about whether or not a patient can treat at a hospital or can treat with her doctor, but not both. The point of the doctrine of apparent agency, as the Supreme Court decided in Gilbert, is addressing a legal inequity. It's not about whether a patient has the opportunity to treat where she wants with whom she wants. It's about whether a hospital has properly explained to patients the employment status of its providers. If a hospital holds itself as a provider of care and if a patient relies on that holding out, then the hospital may be responsible for the act of its independent contractors. But, as the Gilbert court emphasized, if a patient knows or should have known that her treating physician is an independent contractor, then the hospital is not responsible for the reached in this case. Illinois courts have worked to refine the policy announced in Gilbert ever since the decision came down more than 25 years ago. It was a difficult inequity that the court was seeking to address, this idea that a hospital could advertise its services, but hire independent contractors, and as a legal matter, avoid any responsibility. The question became, per Gilbert, whether or not a hospital has made clear to its patients that care is being provided by independent contractors. In that situation, liability will attach to a hospital only, where the patient is the apparent or a sensible agent of the hospital. But, and this is the most important point here, as courts throughout this state have held, if a patient knows or should have known that the treating physician is an independent contractor, then the hospital will not be liable. And therefore, the relevant inquiry becomes whether the plaintiff knew the physician was an independent contractor. So, back again to your question, Justice McLaren, it's not a choice of whether a patient can treat at a hospital or whether a patient can treat with her physician, but not both. The patient can do that. It's a question of understanding. It's a question of whether the hospital has made clear the employment relationship between those entities. And if the hospital has, then the hospital may not be responsible for the actions of that physician. So, that's the critical distinction. And Gilbert lays that out specifically in that decision. The Illinois Supreme Court tried to clarify, quote, except for one who seeks care from a specific physician, if a person who voluntarily enters a hospital without objecting to his or her admission to that hospital, then the person is seeking care from the hospital itself, as opposed to care from his or her personal physician. So, that leads us to reasonable reliance. These two elements, did the hospital clarify to its patients that the physicians were not employees of the hospital? And did the patient enter the hospital with the understanding or the belief that she was seeking care from the hospital itself? Here, the circuit court found that based on the underlying facts, Ms. Purton could not satisfy that second element. What the circuit court decided is she did not justifiably rely on any perceived, she didn't justifiably rely on any perceived holding out because she was seeking care from her specific physician. But actually, based on the facts of this case, she can't satisfy either requirement under Gilbert. Kishwaukee did not hold itself out as a provider of care without informing her that her physician was an independent contractor. And Ms. Purton, she elected to proceed with treatment at Kishwaukee because she was seeking care from her specific physician. So, looking at the first point, this idea of holding out, Kishwaukee did not hold out as a provider of medical services without informing its patients that its physicians are independent contractors. And we see that from the language of the consent form. As courts have held, as this court held, Justice McClaren, I know you were on the Cherokee panel, as those decisions have emphasized, when a general consent form includes a paragraph that clearly identifies, without confusing language, that the physicians are independent contractors and not employees or agents of the hospital. In that situation, when the language is clarified, clear, clearly given to a patient, that satisfies Gilbert's fundamental requirement that a hospital inform the patient that care is being provided by an independent contractor. And this case is analogous to cases in Illinois. The language of the consent forms is analogous. The language that has found exactly that, that it's a clear statement that the physicians are independent contractors, not physicians. Justice Hutchinson, you were asking about the specific language in the consent forms. And actually, there are two. In the first consent form, physician services is actually highlighted, bolded, underlined. And in that paragraph states, as was read, physicians providing care are independent practitioners and are not employees or agents of Kishwaukee Community Hospital. And the patient, Ms. Pruden, was actually required to initial that paragraph. She was not required to initial every paragraph on that page. She was required to initial that one because it was so there is an even clearer statement that physicians who participate in her procedure, in that case, an obstetrical delivery, are independent contractors. So the hospital did provide specific language, language that has been found consistently by Illinois courts to clearly identify that a physician is an independent contractor. That's not a holding out. Now, to be sure, Illinois courts have said that in certain circumstances, there can be additional evidence of a holding out. But that consent form is the most important. And this is not a case where there is additional evidence of a holding out that would make the consent form less clear or more confusing. This is actually something that was mentioned by plaintiff's counsel. He was talking about the physicians and Dr. Hobson wearing scrubs with Kishwaukee on them. That's not correct. Dr. Hobson testified she wore nothing that had the indicia of Kishwaukee on it at the time of delivery. That could have potentially been confusing in the face of the consent form. There was an identifier of Kishwaukee on the tag of the scrub, not visible to the public. So there's not that additional potential evidence that could somehow take this out of that analysis of whether there was a clear statement by the hospital explaining to a patient this particular physician is an independent contractor. So there is no holding out sufficient in this case to implicate the concerns identified in Gilbert. And the second piece of this, reasonable reliance, is also not, it does not, in fact, in this case, do not implicate the policy concerns identified in Gilbert. And Justice Bridges, you were asking a little bit about this, the very point that is raised by Gilbert. And you too, Justice McLaren. Did the patient decide that she wanted to treat with this hospital or did she want to treat with a specific physician? Here, she asked to treat with a physician whose services would eventually lead her to deliver at Kishwaukee. But she treated those physicians in their private offices. She treated with them outside of the hospital. If it had been fundamental when Ms. Pruden called her Medicaid provider that she treat at Kishwaukee as opposed to treating with someone who would accept her insurance, she could have skipped the step of calling her provider. If all she was concerned about was treating at the hospital, she could have gone to the hospital and sought some sort of a referral directly from the hospital. That's not what happened here. Here, she looked for a specific physician to provide her services and eventually for that physician to deliver her at a hospital with which she was familiar. That's what makes this analogous to York. And I realize my time is up if I can just finish that one statement. York is a similar situation with a patient who wanted to treat at a specific hospital. It was not the physician that was requested that eventually was alleged to have practice. It was a physician assigned by the hospital, a different physician. Had we been talking about a physician selected by the patient specifically, there would have been no justifiable reliance and that's the situation we have here. Thank you. Justice Hutchinson, do you have any questions? Hello? As soon as Jeff turns that timer off, I'll be happy to start. My timer. I don't know what timer it is, but it's annoying. All right. Ms. Weiler, let's go to the consent form. The next paragraph, as I noted with Mr. Quinn, talks about the training of the doctors, physicians, specialists will be at the hospital. That appears inconsistent with the paragraph immediately before it to me. Tell me how it isn't. There are two reasons, Your Honor. First, because there is no equivocation that suggests some physicians, let's look at the first paragraph and then the second paragraph to be clear. In the first paragraph, there's no equivocation about some physicians who participate in the procedure are independent contractors, but somehow other physicians may not be. So, right there, it's a clear statement that all physicians are independent practitioners, full stop. The second paragraph does not suggest anything different. It merely discusses the possibility of training. And the best analogy I can give the court for that would be thinking of an academic institution. Just because there are physicians rounding through or perhaps doing studies or doing any of the number of things that physicians do while training, those positions are not necessarily and very seldom are. Employees, I shouldn't say very seldom, but are not always employees of that hospital. There are myriad reasons someone may be observing or training, and that does not create some sort of an employment relationship. That's the distinction. And nothing in this paragraph suggests an employment relationship. Simply acknowledging that physicians, nurses, and other healthcare personnel may be training. It does not suggest that they are training as employees of Keshawake Community Hospital. But as a layperson looking at that, would you agree that if the hospital says, well, we're training them, we have some responsibility for them? I don't. Because I guess the phrase some responsibility is what gives me pause. There's a difference between an employment relationship and, for example, having some responsibility meaning giving them access. And I'm not trying to be coy with that answer. It's, for example, as we all know, healthcare information is intensely personal and is private and can't be disseminated without the patient's consent. That privacy concern, that privacy implication is entirely unrelated to an employment, a suggestion of an employment relationship. So it gives me pause to think that the hospital wouldn't have any sort of responsibility. I realize that wasn't your word, Your Honor, but that's the suggestion. Yes, go ahead. Well, maybe this is another way to phrase the question. Why would Keshawake have an interest in training these people if it were not for the fact that they're holding them out as professionals in their field in that hospital? I think the difference is the last phrase the court used, professionals in their field. I agree. That's what the hospital would be holding them out as, but not necessarily in that hospital. They could be students at a different hospital, perhaps they're nursing students who are rounding through the hospital learning their trade, learning their craft. That doesn't suggest an employment relationship. It's a training exercise. It would sort of be akin to somebody observing these proceedings while we're still in the courthouse in Elgin and somehow suggesting that the court were responsible for the person who's observing those proceedings. That person certainly had to gain access to the courtroom. I realize courtrooms are public spaces. It's a slightly different situation, but there's still no implication of an employment relationship. It's a training exercise. Even I, as a layperson, I don't think I would assume there's an employment relationship. I think I would be more inclined to assume there's some sort of an academic reason for that. I would hope that the hospital would obtain my consent before they would allow somebody into my hospital room when I don't know who that person is. That's what this paragraph speaks to, not an employment relationship. I do not think it's inconsistent. Okay. You know, the big gorilla in this room is when this consent was tendered, according to the deposition and according to the information we have in this record, and it is after she's in the hospital, getting ready to deliver, getting ready for an epidural shot. Even though she's had two other children, I think that, you know, giving birth is a remarkable situation, and you're not always looking at the papers shoved in your face. If this was so important to the hospital, why wasn't this tendered at a different time? There could be any number of reasons for that, Your Honor, from the time of presentation at the position where she can actually sign off on these documents. It's certainly not clear from the record when they were given to her versus when they were entered into the system. But the much more important point relates back to, well, there are two things. One concerns the timing of this. It was a couple of hours after she arrived at the hospital, but it was also, I think, more than six hours before she gave birth. So this is a situation where she's in delivery, actually pushing the baby out. And that relates back to my second point, which is Illinois appellate courts have not drawn a distinction between the validity of the consent and the circumstances in most situations where the consent was obtained. In fact, you look at cases like Wallace versus Alexian Brothers Medical Center or Gore versus Provena. In both of those cases, the consent forms were signed after treatment began. Now, there is a distinction there because the consent forms were signed in both cases by a guardian, but they were signed after treatment began. And the point there is this isn't a situation where the Illinois courts have said if treatment begins, then it's too late. You can't get a valid binding consent form. You absolutely can't. And that's been held consistently more than once. It's not directly analogous, but it's not dissimilar from the idea that you can get a valid consent from a non-English speaking person. As long as that consent is signed, and in this situation it's validly signed, there was no suggestion that it wasn't understood. In fact, there's a provision here that specifically states that the patient acknowledges that she understands the terms of the consent she signed off on that. And that is binding. That means that she recognized that she had read these documents, she understood what they meant, and she moved forward with her treatment. The fact that she was in labor does not, and I mean labor, she was not actively delivering. The fact that she was in labor doesn't change the validity of the consent. Most of the cases that we've seen in this area deal with emergency room. And certainly I'm not saying that these cases, Gilbert, and some of these others should only deal with the emergency room. But checking into an emergency room is a little different than checking in under regular circumstances to give birth to a child. In the emergency room, they triage you and they send you in. Allegedly, there's an emergency. In delivery, there's usually time, unless you have stayed at home too long or circumstances. So as she's checking into the hospital, why isn't the form then? And, Your Honor, I can't answer that question from the information in the record, but it does appear that in its way, the forms were handled in that manner. They were handled before she, again, and exactly as you say, if someone had waited too long and presents at the hospital actively delivering the baby, that would be a different situation from this where she was simply laboring and she hadn't been, she was in the process of it being administered to her but I think what the court, if I can just add one thing to that, I don't, if the court has follow up, I don't want to interrupt that, but that also speaks to the situation in this particular case where this is a situation where the plaintiff presented at the hospital because she was seeking care from the hospital and had no other relationship with this physician. She had been treating with these physicians and with Northern Illinois Fertility the entire course of her capstone to it. So, this is not a situation where she didn't know these physicians. She had never worked with these physicians. She was in an emergency and she had to receive these services. She knew who these physicians were and she presented at the hospital because her private physicians wanted her to deliver at that hospital. That's crucial for the justifiable reliance piece of this analysis. All right. Well, let's talk about who, how she got to Kishwaukee. She had experience there. Her previous doctor apparently left the state or was no longer available in that geographical area. So, she called the insurance and said, I want to go to Kishwaukee. I need a new doctor. Can you give me some information? Well, apparently they gave her information about another hospital as well but they gave her the names of these doctors. So, why do you say that she was relying more on the doctors than she was relying on the hospital and its quality of care? So, this goes back again to what is the policy articulated in Gilbert? Gilbert was a case trying to prevent hospitals from soliciting patients, advertising to them, and not telling them that patients who wanted to treat at that hospital might be treating with independent contractor physicians. This is a case where the patient wanted to treat, she said she wanted to treat at Kishwaukee, but she had insurance and she had the opportunity to select her physician, her private physician. That's what she did here. She asked for her insurance company, for her insurance provider for Medicaid, not for Kishwaukee to make a recommendation to her. She theoretically could have called Kishwaukee or gone to Kishwaukee. She didn't do that. She asked, I have this particular insurance. I have Medicaid. Called her Medicaid provider, not Kishwaukee, said I want to deliver at this hospital. In this case, she has testified that it's because she delivered there previously, but it could be because she lived closer to Kishwaukee hospital. You can think of a myriad of reasons why it might be more convenient for a patient to want to go to that particular hospital. But this wasn't a situation where Kishwaukee said, here is our physician. You can treat with our physician. That information came from the insurance company. This also takes us back to York. York is a case in which the plaintiff initially treated at Rush because the plaintiff wanted to use an orthopedic surgeon affiliated with Rush. There was a specific connection there. But the ultimate finding of potential liability, the ultimate finding in Rush that the Gilbert requirements were satisfied, it wasn't related to the fact that the patient wanted to treat with an orthopedic surgeon affiliated at Rush. It was because when the patient treated with that orthopedic surgeon at Rush, Rush also supplied additional physician assistance through the anesthesiology department. It was the anesthesiologist supplied by Rush who created, who was potentially the apparent agent of Rush. Not the original orthopedic surgeon. And that's more analogous. The orthopedic surgeon analogy is what we have here. A patient who decides, I want to go to this particular hospital, but she chooses her private physician based on the availability of that private physician and where that physician has staff privileges. And even in Yarborough, there is reference to the idea that simply because a physician has staff privileges at a particular hospital, that does not create an agency relationship between the hospital and the physician. But most insurance companies, on the back of a card that you carry in your wallet or wherever you happen to carry it, says before extraordinary proceedings, and of course I'm paraphrasing here, in pregnancy, although it happens a lot, if she's considered somewhat extraordinary because of the length and general cost, you must consult with your insurance company and get preapproval. Not preapproval to be pregnant, but preapproval to go to a hospital and engage a doctor. So she did what she was told to do. She wasn't told to go to Kishwaukee first, they recommended a doctor, she went to an insurance company first. Why is it still not relying on Kishwaukee primarily as the hospital in which to deliver? Because she's not relying on Kishwaukee for that. She's relying on Medicaid to give her information about what her available options are. She's not relying on Kishwaukee to give her a recommendation. Okay. All right. Thank you, Ms. Wyler, and thank you, Justice McClaren. I have no other questions. Thank you. Justice Bridges, do you have any questions? I do. Thank you. Counsel, could the advertisement that Justice Hutchinson read earlier, so I won't read it again now, that was published by the hospital with Dr. Hobbs' image and bio, need a reasonable person to conclude there was an employee and employer relationship? I don't believe so. Actually, I think Justice Hutchinson pointed to the operative language in this particular advertisement that would keep a reasonable person from reaching that conclusion. It mentions that Dr. Hobbs was an obstetrics nurse at the hospital, but now it references the medical staff. She joined the medical staff and is practicing with Dr. Baumgart of Northern Illinois Fertility in DeKalb. This is not an advertisement that states, for example, Dr. Hobbs was an obstetrics nurse, but now has returned to Kishwaukee on the staff, or something to that effect. That's not, or as a hospital employee, or something to that effect, has returned to the community after medical school. This actually specifies that Dr. Hobson is on the medical staff, which Illinois cases have said is not the same as being an employee, and it specifically states she's practicing with Dr. Baumgart in a private physician's office. So, I don't think that this suggests an employment relationship to the average person. But does it, in fact, satisfy the holdout requirement of Gilbert, though? I don't believe that it does, because it's not holding Dr. Hobson out as an employee of the hospital, but to the extent that the court could find that it does, to the extent the court says, look, this is an advertisement, Dr. Hobson's face is on it, that's why the consent form becomes important here, because the consent form clarifies any potential confusion that may exist, and I don't think there is confusion. But to the extent the court were to find that, the hospital has made, in the consent form, a very clear and specific statement advising its patients our physicians are not employees of the hospital, and that is what is required under Gilbert. Gilbert requires that the hospital make that clarification. And as long as the patient is informed that care is being provided by an independent contractor, that satisfies the concern raised in Gilbert, the public policy. Since we're dealing with the issue of a summary judgment here, and just to follow up to what, again, Justice Hutchinson asked, when we have the plaintiff entering the hospital, she's in labor, and two hours later, she's given this consent form to sign, might this not affect her knowing and voluntary nature of her consent? No, Your Honor, there's nothing that suggests that, there's been no testimony, there's nothing in the record that suggests that somehow, because Ms. Bruton was in labor, she was unable to read the documents, understand the documents, the consent forms, or give her knowing consent. There is no testimony about that, and I would hazard a guess that most women who have been through the process of having a child understand that you're not unable to read or think over the course of delivery. Again, that's why it's important that this is not a situation where she was actively in the process of delivering the baby, she was laboring, that doesn't mean that was unable to focus. Well, again, addressing that elephant in the room, having the number of children I have, my question is, when this consent form was presented to her, what option did she really have? That is an issue that has been addressed, again, in the same cases that I have said, even in emergency situations, consent is binding. Incidentally, I should add that those are situations of enormous stress, where perhaps, for example, in Wallace, it's a parent who is being handed consent forms for a 14-year-old child who's been struck by a car and is in such serious condition that eventually she dies. That consent is still binding. That's an enormously stressful situation that even Illinois courts or that Illinois courts have found, even then, the patient is able or the guardian is able to give binding consent. And more to your point, what happens if she doesn't want to give consent? Well, Wallace addresses that in that situation, too. Consent need not be obtained if an emergency arises and treatment is required to protect the patient. The hospital is entitled and, in fact, required to advise the patient of the employment status of the physicians who are treating her. And if that's done properly, it is sufficient to put the plaintiff on necessary notice. And that's what happened here. Thank you, Ms. Weiler. And thank you, Justice McClaren. I have no further questions. I have no questions. Justice Hutchinson, do you have any questions? No. No, thank you. Nothing else. Okay. Very good. Thank you, Your Honor. With that, we ask that the Court affirm the ruling of the Circuit Court. Thank you. Okay. Mr. Quinn, you may proceed. Thank you, Judge. I want to start by kind of where we finished off, with the questioning of Ms. Weiler. If you look at the cases that the defendant is relying on for this idea that the timing of the consent forms is not relevant, it shouldn't be considered. I think, as the Court has identified, those involve cases where there is emergency, life-saving, perhaps, care at issue. And I think the courts are doing their thing as a matter of public policy. They're going to hold a particular way on the issue of a parent agency. That does not fit into this fact pattern, for which reason the public policy that's expressed in Gilbert should control. And that is that there is a unique relationship between doctors and patients and doctors and hospitals. And the hospitals want the benefit of the business that they get. And they want to protect themselves, on the other hand, against claims against them for the negligence of the doctors. And if they want to do that, then they have to put the plaintiff on clear, unequivocal notice at a proper and timely point in time. And this case, as Your Honors has been questioning the defense, we don't see that here. She did not have a choice. She had been administered anesthesia. Already a test dose of anesthesia eight minutes before she even signed a consent form. And there is a case, we cite the case Fragionis, that does say that the timing of the consent form is a consideration for a parent agency. While maybe a little different factually, certainly the disclaimer that's contained in the consent form. The hospital is in complete control of this process. They can present and acquire signatures when they want to. If they fail to do that at a proper and timely time, they have to bear the consequences of that and not the patient. And that is consistent with Gilbert and all the cases that follow Gilbert. Secondly, you know, to this question about did she seek the care of a specific physician or the hospital? The hospital certainly has a point of view about that, but we cannot deny in the summary judgment what Mrs. Crutten said about that, because that is evidence. And that's set forth in her deposition and it's set forth in her affidavit and she clearly says that she chose not a specific physician, but she chose the hospital. I think a lot of what the defense has argued here today, and certainly I think it's reflected in the trial court ruling, is that the consent form is somehow dispositive of this and should overcome all the evidence presented by the plaintiff on holding out and reliance, and that is just not the law of Illinois. It's reflected in every case. Additional evidence can be introduced. There is additional evidence outside the consent form on both holding out and reliance. A jury should hear that evidence and their own decision. Advertisement is relevant to holding out. That's clear from the case law. The case law specifically states, I'll just note, that whether she saw a particular advertisement is not relevant. The hospital is bound by the holding out that they make to the public in general. So although we do have holding out that she did rely on, I want to make it clear that while they did hold out Dr. Pops in a specific advertisement, Mrs. Prutten does not lose this issue if she didn't see that. And factually, I will point the court to representations in that advertising that the court asked the defense about. You know, there's a mix of things here. Certainly, there's a link to a website, www.tishhospital.org, where it says to learn more, click on find a doctor. In another press release, it says headline, Tish Hospital welcomes new doctors. What is a reasonable person to think when they read about those doctors that are being referred? I think a reasonable person can conclude from that that there is an employment relationship. And with regard, I'll just finish up on the training language and the consent form. That's a classic question of fact. There was some questioning. The defense suggested that that can only be read one way. I disagree. I think that invites competing inferences and conclusions to be one problem with the clarity of the consent form that militates in favor of the plaintiff. Thank you. Justice Hutchinson, do you have any questions? Probably not. I'd only be repeating myself. Thank you. Very good. Justice Bridges, do you have any questions? I do. Counsel, when I look at the Gilbert elements and I see that the plaintiff was notified, initial sign that Dr. Hobson was not an employee, but rather an independent contractor, shouldn't Cherokee and James be dispositive of that issue for us? Judge, I don't think so. I think that, again, there are the most significant points. That is the timing element. I don't think Cherokee and James had similar facts where you have a plaintiff who is already, for all intents and purposes, a patient of the hospital. The patient's already receiving care. There is no informed consent. If informed consent means anything, it means that a person has to be given a choice before they accept care subject to the provisions or disclaimers that the hospital wants to use against them at a future date. I don't think that Cherokee or James indicate that. They don't have that same fact pattern. I would want to see from Cherokee and James other distinctions, whether or not the doctors in that case were specifically listed or whether their practice group was specifically on the consent form. In this case, we know neither Dr. Hobson nor Northern Illinois Fertility was. I think those are very important distinctions for which reason Cherokee and James do not control this case and are not dispositive. You brought up the case of Faggiannis. Isn't that a case where the patient was distinguished from this one because it was a third party who signed the consent form and the negligence had allegedly already occurred and the patient was brain dead? I think that is a recitation of the facts of the case. I mentioned Faggiannis simply in response to the defense attorney's statement that there have been no cases that timing of the consent form is relevant under a parent agency. I highlight Faggiannis because Faggiannis is a case that says, in fact, it is. While in Faggiannis, it was different in terms of the conduct that had occurred, the negligence had occurred by the time that this consent form was signed in that case. That stands for a broader principle that I believe supports the plaintiff, that the timing of the consent form is important, is relevant, and we can invalidate the consent form. Thank you, Mr. Quinn and Justice McClaren. I have no further questions. Thank you, Justice Bridges. Mr. Quinn, the plaintiff had two children delivered at Kishwaukee previously, correct? Correct. And the doctor who delivered them was no longer available because he left to go out of state, is that correct? That's my understanding, yes. Has there been anything put of record as to whether or not during those prior births the same disclaimer was presented to your clients? I'm sorry, I got a little feedback there, Judge. It was a very tough question. No, it was just the audio. I'm joking. But anyway, did she sign disclaimers or was she told? Was there anything to indicate one way or the other whether or not she knew whether or not the doctor was an employee of the hospital or not? My understanding, Judge, of the record is the only evidence we have on that is, I think, from Sherry Prutten's deposition where she said she believed that Dr. Hirsch was his name, to your question about what did consent forms for those prior pregnancies contain in terms of a disclaimer? I don't think that that exists in the record because I think if it did, we would be hearing more about that from the defense. Okay. I have no further questions. Thank you. Thank you, Judge. Justice Hutchinson, do you have any other questions? No, thank you. Justice Bridges? No, thank you. Okay, thank you. We've heard from both parties. There have been questions asked and answered. I believe the case is now completed and done, and I hereby, after saying that we will take the case under advisement and render a disposition in apt time, I now declare the oral argument terminated. Thank you. Thank you. Thank you, Your Honor.